# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| ADVANCED NEUROMODULATION | § | |
| SYSTEMS, INC. | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| v. | § | |
| | § | Civil Action No. 4:04cv131 |
| ADVANCED BIONICS CORPORATION, | § | (Brown) |
| | § | |
| **Defendant.** | § | |

## EXPERT REPORT OF CHARLES DANIELS, PH.D. REGARDING THE CONSTRUCTION OF CLAIM TERMS IN U.S. PATENT NO. 6,216,045

### I.     BACKGROUND AND QUALIFICATIONS

1. I have been the President of Materials Performance Consulting, LLC since 2003. In that position, I consult on many polymer materials issues, including product and process diagnosis and resolution and structure property relationships.

2. From 1997 to 2003, I was President of Polymer Diagnostics, Inc.  There, I oversaw research, testing, and consultation relating to polymer materials, including in applications such as medical devices, electronics, consumer goods, automotive products and construction.

3. From 1993 to 1997, I was Director of Technology at the Geon Company. From 1969 to 1993, I held a number of positions at Geon's predecessor, the BF Goodrich Company, including R&D Scientist, Manager of R&D, and eventually Director of R&D. In these various positions, I managed and was involved in research and development concerning different types of polymers.

4. I received a Ph.D. in Chemistry and Polymer Science from Case Western Reserve University in 1969.  I also received an M.S. in Chemistry and Polymer Science

13. I understand that patent claims should be construed from the perspective of a person of ordinary skill in the field to which the patent relates. In my opinion, the person skilled in the field of the '045 patent would have at least a bachelors degree in polymer science, mechanical engineering or a related field or several years of experience with polymers used in medical devices. I am at least a person of ordinary skill in this art.

14. I expect to testify at the patent claim construction hearing in this case about my opinions as set forth below and the bases therefore. I reserve the right to supplement these opinions and will likely respond at the hearing to any opinions of ANS's experts regarding the construction of the '045 patent.

### A.   "the lead body is formed of a material having prescribed mechanical properties"

15. The first limitation of claims 1, 12 and 14 recites a "lead body formed of a material with prescribed mechanical properties." In my opinion, it is not possible to determine what is covered by this language.

16. The claims do not specify any properties of the lead body. The patent specification is also unclear as to which mechanical properties are prescribed. For example, in column 1 lines 15 to 20, the patent refers to "common requirements" for implantable leads, including "flexibility, strength, and durability" and refers to them as "prescribed characteristics." Later in the patent specification at column 3, lines 46 to 54, it discusses the properties of the lead body as follows:

> Spanning between electrodes **18** of the distal end **14** and terminals **16** of the proximal end **12**, body **22** is formed from a medical grade, substantially inert material, for example, polyurethane, silicone, or the like. While the specific material used for body **22** is not critical to the present invention, body **22** must be non-reactive to the environment of the human body, provide a flexible and durable (i.e., fatigue resistant) exterior structure for the components of lead **10**, and insulate adjacent terminals **16** and/or electrodes **18**.

While the properties listed in these two sections overlap, they are not identical. Nevertheless, for purposes of this report, I will assume that the lead body must be formed

3

20. None of the examples provided in the patent assist in understanding what specific types of lead body materials are covered by the claim language. For example, the patent states that "polyurethane, silicone, or the like" may be used. This language is very broad and could encompass materials that are chemically very different, such as pure silicone polymers, pure urethanes, combinations in between (e.g., co-polymers, blends of polymers), various rubbers and plasticized vinyls. These materials have significant variations in their mechanical performance, many of which would not be suitable for use in an implantable stimulation lead.

### B.   "insulative material having mechanical properties consistent with the material of the lead body"

21. Claims 1, 9, 12 and 14 each have one or more limitations that require "insulative material having mechanical properties consistent with the material of the lead body." This language is used in two different contexts. In the second and third limitations of claims 1, 12 and 14, it refers to the material between electrodes and between terminals. In the last limitation of claims 1, 12 and 14, as well as claim 9, it refers to material that is used to substantially fill an interior passage of the lead or to form a substantially solid portion of the lead.

22. In my opinion, the person of ordinary skill in my field would not understand what the language "insulative material having mechanical properties consistent with the material of the lead body" encompasses as used in either context.

23. The properties of the insulative material that must be "consistent with" the lead body material appear to be the "prescribed mechanical properties" referred to above for the first limitation of claims 1, 12, and 14 – *i.e.,* which I am assuming are non-reactivity to the human body, flexibility, durability, strength and insulative ability.

24. A skilled person would not understand in what circumstances a material is considered to have "consistent" non-reactivity to the human body, flexibility, durability, strength and insulative ability with another material. Once again, to a skilled person,

5

same mechanical properties" connotes differences but is unclear to what extent the mechanical properties of the two materials may vary. It is unclear which of these two possible meanings the patentees intended by the term "consistent with" or whether the patentees intended something else.

29. I have also considered the one example of a spacer material provided in the '045 patent to see whether that would assist me in determining what the patentees intended to cover by the language "insulative material having mechanical properties consistent with the material of the lead body." This example also compounded the lack of clarity in the claim language.

30. The patent identifies Bionate 75D from Polymer Tech. Group as an example of a spacer material. Bionate 75D is a highly engineered polyurethane copolymer. Attached as Exhibit C is information about this material. I would not consider this material to have similar mechanical properties as most polyurethanes or silicones, which are identified as examples of lead body materials in the patent.

31. Thus, in my opinion, for the claim language "insulative material having mechanical properties consistent with the material of the lead body" to have any meaning to the skilled person, it must be construed such that the insulative material has the same values (as that concept is understood in my field) for the specific mechanical properties I identified above (i.e., hydrolytic stability, coefficient of friction, abrasion resistance, water absorption, skin and subcutaneous tissue sensitivity, flexural modulus, flexural strength, tensile modulus, ultimate tensile strength, ultimate elongation, hardness (durometer), tear strength, compression set, coefficient of linear expansion, conductivity, insulation resistance, dielectric resistance, and dielectric strength) as the lead body.

32. The file history supports this construction. In responding to a rejection based on U.S. Patent No. 4,379,462 to Borkan, the patent applicants stated that "medical grade epoxy does not have the mechanical properties of, for example, the polyethylene material of sheath (12) of Borkan."

7

### E.   "substantially solid"

37. Claim 12 refers to a lead region that has a "substantially solid cross section . . . ." Claim 14 refers to a lead portion "formed from a substantially solid, fused matrix of material . . . ." In my opinion, it would not be clear to a skilled person to what extent the region or portion must be solid to satisfy the "substantially solid" language. A skilled person would understand the term "solid" to mean that the region or portion has no internal cavity.

### F.   "fused matrix"

38. Claims 8 and 11 each recite insulative material that is a "fused matrix."

39. Claim 13 refers to a lead portion "wherein the materials(s) forming the first region . . . is a fused matrix."

40. Claim 14 refers to a lead portion "formed from a substantially solid, fused matrix of materials . . . ."

41. A skilled person would understand the term "fused matrix" to mean a material that is formed by melting and bonding of at least two other materials together.

### G.   "consistent mechanical characteristics"

42. Claim 14 refers to the stimulation portion of the lead formed from a "substantially solid, fused matrix of materials having consistent mechanical characteristics." In my opinion, a skilled person would not understand what mechanical characteristics are being referenced or how to determine whether such characteristics are "consistent" for the same reasons I set forth above for the claim language "insulative material having mechanical properties consistent with the material of the lead body." Moreover, it is not clear from the patent claim language whether the mechanical characteristics are the "prescribed mechanical properties" referred to earlier in the claim or some other set of characteristics.

9

EXHIBIT A

# Charles A. Daniels, Ph.D.

# Publications

1.)    Thermodynamics of Polyisobutylene Solutions - I: Inter-action Parameters from Osmotic Pressure Measurements, J. Macromolecular Sci., Physics, <u>B2(3)</u>, 449 (1968) with S. H. Maron.

2.)    Thermodynamics of Polyisobutylene Solutions - II: Vapor Pressures and Polymer Order, J. Macromolecular Sci.,  Physics, <u>B2(3)</u>, 463 (1968) with S. H. Maron.

3.)    Thermodynamics of Polyisobutylene Solutions - III: Thermal Behavior and Polymer Order, J. Macromolecular Sci., Physics, <u>B2(4)</u>, 743 (1969) with S. H. Maron.

4.)    Thermodynamics of Polystyrene Solutions - I: Interaction Parameters and Polymer Order, J. Macromolecular Sci., Physics, <u>B2(4)</u>, 743 (1969) with S. H. Maron.

5.)    Thermodynamics of Polystyrene Solutions - II: Thermal Behavior and Glass Energies, J. Macromolecular Sci., Physics, <u>B2(4)</u>, 769 (1969) with S. H. Maron.

6.)    Thermodynamics of Poly-$\alpha$-Olefin Solutions, J. Macro-molecular Sci., Physics, <u>B4(1)</u>, 47 (1970) with S. H. Maron and P. J. Livesey.

7.)    Thermodynamics of Polymethylmethacrylate Solutions, J. Macromolecular Sci., Physics, <u>B6(1)</u>, 1 (1972) with S. H. Maron.

8.)    Thermodynamics of Polypropylene Solutions, J. Macromolecular Sci., <u>B4(2)</u>, 227 (1970) with S. H. Maron.

9.)    Common Methods of Particle Size Analyses, J. Paint Technol., <u>47(604)</u>, 35 (1975) with E. A. Collins and J. A. Davidson.

10.)    PVC Part I:  Effect of Polymerization Temperature on Association, Second Virial Coefficients and Molecular Dimensions, J. Macromol. Sci., Physics, <u>B10(2)</u>, 287 (1974) with E. A. Collins.

11.)    Effect of Order on Rheological Properties of Poly(Vinyl Chloride) Melts, Polymer Sci. and Eng., <u>14(5)</u>, 356 (1974) with E. A. Collins.

24.)    Relationship Between the Particle Size and Viscoelastic Properties of PVC Plastisols, with N. Nakajima, J. Appl. Polymer Sci., 25(9), 2019 (1980).

25.)    Effect of Particle Size Distribution on the Gelation and Fusion Behavior of PVC Plastisols As Observed by Changes in Morphology and Viscoelastic Properties with N. Nakajima, E. R. Harrell and J. D. Isner, SPE ANTEC November, 1980.

26.)    Physical Constants of PolyVinyl Chloride, in Polymer Handbook, E. A. Grulke and E. H. Immergut, Wiley, New York (1998) with E. A. Collins and D. E. Witenhafer.

27.)    Modification of PolyVinyl Chloride, in Polymer Modification, Principles, Techniques and Applications, John J. Meister, ed., Marcel Dekker, New York (2000).

28.)    Rubber Related Polymers in Rubber Technology, 3, 561, Maurice Morton, ed., Reinhold, New York (1987) with K. L. Gardner.

29.)    PVC Handbook, co-editor with J.W. Summers and C.E. Wilkes, Hanser Publications, to be published in 2004.

**Director of Technology, 1993-1997.** Responsible for reorganizing and staffing polymer analytical organizations to ensure successful formation of the new Geon company upon its separation from the BFGoodrich Company.  Selected key staff and facilities to support organizational and customer needs.

- Led organization in achieving national accreditation and ISO registration.
- Standardized all manufacturing QC laboratory procedures.
- Successfully resolved key environmental hazard assessment issues.
- Recruited and hired world-class key scientific assets that broadened the organization's skill sets.

**B.F. Goodrich Company:  One of the world's largest tire, rubber, plastics, specialty chemicals and aerospace companies.**

**Director of R&D, 1985-1993.** Reported directly to the Division President, leading R&D programs for the Specialty Elastomers and Latex Division from 1985-1989, and BFG's largest operating unit, the Geon Vinyl Division, from 1989 to 1993.  Responsible for the design and execution of all Research and Development programs, including the Vinyl Division"s new product programs and the Elastomers and Latex R&D and technical service programs.  Recruited, hired and developed key technical resources to support divisions' sales, marketing and manufacturing initiatives.

- Achieved two US patents for new products.
- Increased product revenues 25% in the first year, representing 130% of target.
- Developed several new vinyl products, resulting in the commercialization of the industry's first heat resistant vinyl compounds.
- Responsible for $20M research budget.

**Manager, R&D, 1975-1985.** Led four key research groups in plastics characterization, general purpose and specialty elastomers and PVC resin technology that developed and introduced new vinyl resins for the film, automotive and construction markets.

- Improved reproducibility of elastomer manufacturing process from 40% to over 95% in two years.
- Restructured research efforts in each area; streamlined project management by instituting rigorous accountability procedures and project teams focused on well-defined objectives.
- Drove new efficiencies and quality measures, resulting in significant product uniformity, and more rapid development of new products by forming cross-functional teams with clear division objectives.

**R&D Scientist, 1969-1975.** Responsible for supporting company wide R&D efforts by utilizing modern polymer analytical methods to solve customer problems.

- Developed new polymer characterization methods for key BFG products.
- Led key technical initiatives on two company-wide strategic programs in developing technology to remove vinyl chloride from process streams and to solve critical performance issues delaying the transfer of new resin technology from R&D.
- Developed methods for prediction of process behavior of vinyl resins, a key component leading to BFG's worldwide licensing of monomer removal technology.
- Developed lab-scale methods and computer models to predict behavior of post polymerization behavior of vinyl resins in world-scale manufacturing plants.

Granted two US patents on new products and process technology

EXHIBIT C

# Bionate®

## Polycarbonate Urethane

Home    Materials

- Good Oxidative Stability
- Good Biocompatibility
- Mechanical Strength
- Optical Properties
- Abrasion Resistance
- Extensive FDA Masterfile

Introduction
Chemistry
Properties
Biological Test Results
Processing
Storage
Safety

## Introduction

**Bionate®** *polycarbonate-urethane* is among the most extensively tested biomaterials ever developed. The Polymer Technology Group Incorporated acquired the license to manufacture this thermoplastic elastomer from Corvita Corporation (who marketed it under the name Corethane®) in 1996.

Carbonate linkages adjacent to hydrocarbon groups give this family of materials oxidative stability, making these polymers attractive in applications where oxidation is a potential mode of degradation, such as in pacemaker leads, ventricular assist devices, catheters, stents, and many other biomedical devices. Polycarbonate urethanes were the first biomedical polyurethanes promoted for their biostability.

*Bionate materials have application restrictions. Please contact the PTG Sales Department for details.*

▲ *Top*

## Chemistry

**Bionate®** *polycarbonate-urethane* is a thermoplastic elastomer formed as the reaction product of a hydroxyl terminated polycarbonate, an aromatic diisocyanate, and a low molecular weight glycol used as a chain extender.

▲ *Top*

17

| | | | | | |
|---|---|---|---|---|---|
| Dielectric Constant at 60 Hz | D150 | 5.0 | 4.8 | 4.5 | 3.7 |
| Mold Shrinkage, 4.0" Disk (%) | D955 | 1.2 | 2.5 | 1.2 | 1.2 |
| Mold Shrinkage, Flame Bar (%) | D955 | 0-3.0 | 0-3.0 | 0.5-2.0 | 0.5-2.0 |

▲ *Top*

## Biological Test Results

The scope of Bionate PCU's tests—encompassing Histology, Carcinogenicity, Biostability, and Tripartite Biocompatiblity Guidance for Medical Devices—reassures medical device and implant manufacturers of the material's biocompatibility. This allows biomaterials decision makers the ability to choose an efficacious biomaterial that will add to the cost-effectiveness of the development of their device or implant. Below is a summary of the extensive biocompatibility testing conducted on Bionate PCUs, including its successful completion of a 2-year carcinogenicity study.

| Biological Test | Results |
|---|---|
| Ames Mutagenicity | Non-mutagenic |
| Chronic Toxicity: USP Muscle Implantation | Macroscopic reaction not significant |
| Compliment Activation | Less activation of the compliment system than ePTFE |
| USP Cytotoxicity (MEM Elution) | Non-toxic |
| Hemolysis | Non-hemolytic |
| Humoral Immunological Study | No humoral (serological) immune response |
| USP Pyrogenicity | Non-pyrogenic |
| Platelet Deposition (*ex vivo* shunt) | No difference in thrombogenicity when compared to ePTFE control |
| Sensitization: Magnusson and Kligman | No dermal sensitization |
| Acute Systemic Toxicity | No significant systemic toxicity |
| USP Implantation Test: 7 days in rats | Macroscopic reaction not significant |
| Intracutaneous Toxicity | No significant irritation or toxicity |
| Carcinogenicity: 2 years in rats | Non-carcinogenic |

19

Bionate is supplied in free-flowing pelletized or diced granular forms in moisture-proof bags. Because polyurethanes are hygroscopic, these materials should be stored in a relatively dry area between 60 and 90 °F. Ideally, the entire contents of the bag should be used at one time; however, if less is required, then only remove what is necessary and blanket the remainder under inert gas, such as dry nitrogen, in a resealed container.

▲ *Top*

## Safety

Click on the link below to download a printable copy of the Material Safety Data Sheet (MSDS) for Bionate thermoplastic polycarbonate urethane (requires Adobe® Acrobat Reader®)

- 📄 Bionate MSDS

▲ *Top*

Home    Materials

*Updated 05.05.02*

# Bionate®

## *Polycarbonate Urethane*

Home    Materials

- Good Oxidative Stability
- Good Biocompatibility
- Mechanical Strength
- Optical Properties
- Abrasion Resistance
- Extensive FDA Masterfile

Introduction
Chemistry
Properties
Biological Test Results
Processing
Storage
Safety

## Introduction

Bionate® polycarbonate-urethane is among the most extensively tested biomaterials ever developed. The Polymer Technology Group Incorporated acquired the license to manufacture this thermoplastic elastomer from Corvita Corporation (who marketed it under the name Corethane®) in 1996.

Carbonate linkages adjacent to hydrocarbon groups give this family of materials oxidative stability, making these polymers attractive in applications where oxidation is a potential mode of degradation, such as in pacemaker leads, ventricular assist devices, catheters, stents, and many other biomedical devices. Polycarbonate urethanes were the first biomedical polyurethanes promoted for their

| | | | | | |
|---|---|---|---|---|---|
| Linear Thermal Expansion (x10⁻⁵) | | 88.0°F | 89.3°F | 76.2°F | 51.8°F |
| Melt Index (approx) g/10 min at 224 °C | D1238 | (1200 g) 20.7 | (1200 g) 9.2 | (2160 g) 13.3 | (5000 g) 17.8 |
| Flexural Modulus 1% Secant Modulus (psi) | D790 | 4160 | 6030 | 7000 | 260,000 |
| Flexural Stress at 5% Deflection (psi) | D790 | 180 | 275 | 300 | 10,200 |
| Dielectric Strength (V/mil) | D149 | 430 | 480 | 530 | >625 |
| Dielectric Constant at 60 Hz | D150 | 5.0 | 4.8 | 4.5 | 3.7 |
| Mold Shrinkage, 4.0 Disk (%) | D955 | 1.2 | 1.2 | 1.2 | 1.2 |
| Mold Shrinkage, Flame Bar (%) | D955 | 0-3.0 | 0-3.0 | 0.5-2.0 | 0.5-2.0 |

▲ Top

## Biological Test Results

The scope of Bionate PCU's tests—encompassing Histology, Carcinogenicity, Biostability, and Tripartite Biocompatiblity Guidance for Medical Devices—reassures medical device and implant manufacturers of the material's biocompatibility. This allows biomaterials decision makers the ability to choose an efficacious biomaterial that will add to the cost-effectiveness of the development of their device or implant. Below is a summary of the extensive biocompatibility testing conducted on Bionate PCUs, including its successful completion of a 2-year carcinogenicity study.

| Biological Test | Results |
|---|---|
| Ames Mutagenicity | Non-mutagenic |
| Chronic Toxicity: USP Muscle Implantation | Macroscopic reaction not significant |
| Compliment Activation | Less activation of the compliment system than ePTFE |
| USP Cytotoxicity (MEM Elution) | Non-toxic |
| Hemolysis | Non-hemolytic |
| Humoral Immunological Study | No humoral (serological) immune response |
| USP Pyrogenicity | Non-pyrogenic |

Extruder Configuration

| Parameter | Value |
|---|---|
| Length to Diameter Ratio | 24:1 |
| Compression Ratio | 2.5:1 to 3.5:1 |
| Cooling Water Temperature | 18-20 °C (64-68 °F) |

▲ Top

## Storage

Bionate is supplied in free-flowing pelletized or diced granular forms in moisture-proof bags. Because polyurethanes are hygroscopic, these materials should be stored in a relatively dry area between 60 and 90 °F. Ideally, the entire contents of the bag should be used at one time; however, if less is required, then only remove what is necessary and blanket the remainder under inert gas, such as dry nitrogen, in a resealed container.

▲ Top

## Safety

Click on the link below to download a printable copy of the Material Safety Data Sheet (MSDS) for Bionate thermoplastic polycarbonate urethane (requires Adobe® Acrobat Reader®)

- 🖺 Bionate MSDS

▲ Top

Home    Materials

*Updated 05.05.02*

25

**EXHIBIT B**

Daniels.txt

1

```
 1        IN THE UNITED STATES DISTRICT COURT
          FOR THE EASTERN DISTRICT OF TEXAS
 2               SHERMAN DIVISION
                    - - - - -
 3
   ADVANCED NEUROMODULATION)
 4 SYSTEMS, INC.,          )
                           )
 5          Plaintiff,     )
                           )
 6          -v-            ) Civil Action No.
                           ) 4:04CV131
 7 ADVANCED BIONICS        ) (Brown)
   CORPORATION,            )
 8                         )
            Defendant.     )
 9
                    - - - - -
10 VIDEOTAPED DEPOSITION OF CHARLES DANIELS, PH.D.
              Friday, February 4, 2005
11                  - - - - -

12 Videotaped deposition of CHARLES DANIELS,

13 PH.D., called by the Plaintiff for

14 examination under the Federal Rules of Civil

15 Procedure, taken before me, Grace M. Hilpert,

16 Registered Professional Reporter, a Notary

17 Public in and for the State of Ohio, at the

18 offices of Jones Day, North Point, 901

19 Lakeside Avenue, Cleveland, Ohio 44114,

20 commencing at 9:28 a.m., the day and date

21 above set forth.

22                  - - - - -
                 CORSILLO & GRANDILLO
23                COURT REPORTERS
               700 City Club Building
24             Cleveland, Ohio  44114
                  216-523-1700
25                  - - - - -
```

2

```
 1 APPEARANCES:

 2     On Behalf of the Plaintiff:

 3         B.C. Boren, Esquire
           Christopher W. Kennerly, Esquire
 4         Baker Botts, LLP
           2001 Ross Avenue
```

Page 1

```
                                        Daniels.txt
5          Dallas, Texas   75201-2980

6      On Behalf of the Defendant:

7          Jennifer A. Sklenar, Esquire
           Howrey Simon Arnold & White
8          550 South Hope Street, Suite 1400
           Los Angeles, California  90071
9
                        - - - - -
10
   ALSO PRESENT:
11
           Steve Henschel, Videographer
12
                        - - - - -
13

14

15

16

17

18

19

20

21

22

23

24

25
```

⬜                                                                              3

```
1                      INDEX

2

3  EXAMINATION:                      PAGE:

4

5  BY MR. BOREN:                       4

6

7              - - - - -

8

9  PLAINTIFF'S EXHIBITS:          PAGE:
```

Page 2

Daniels.txt

10

11          1                               11

12          2                               34

13          3                               64

14          4                               66

15          5                               69

16

17                    - - - - -

18

19

20

21

22

23

24

25

                                                                    4

 1                  THE VIDEOGRAPHER:  Today's

 2          February 4, 2005.  We're on the

 3          record at 9:28 a.m.

 4                    - - - - -

 5             CHARLES DANIELS, PH.D.

 6  called by the Plaintiff for examination under

 7  the Federal Rules of Civil Procedure, after

 8  having been first duly sworn, as hereinafter

 9  certified, was examined and testified as

10  follows:

11                    - - - - -

12                  EXAMINATION

13                    - - - - -

14  BY MR. BOREN:

Daniels.txt

15  Q     Dr. Daniels, my name is B.C. Boren.

16  You and I met just a few moments ago.

17        You do, in fact, have a Ph.D., do you

18  not?

19  A     Yes, I do.

20  Q     What other degrees do you have?

21  A     Master's degree, an MS, and a

22  Bachelor's degree, a BA.

23  Q     What was your Bachelor's degree in?

24  A     Chemistry.

25  Q     And your Master's?

                                                    5

 1  A     Polymer science and chemistry.

 2  Q     And your Ph.D.?

 3  A     Polymer science and chemistry.

 4  Q     What is polymer science?

 5  A     The study of very large molecules.  For

 6  better or for worse, that's the best

 7  description.

 8  Q     What is a polymer?

 9  A     I'm sorry?

10  Q     What is a polymer?

11  A     A polymer is a long chain molecule that

12  consists of a number of repeating units that

13  could reach molecular weights of several

14  hundred thousand.  Generic term for polymers

15  is plastics.

16  Q     Are polymers typically organic, are the

17  molecules organic molecules, are they

18  synthetic or are they one or the other?

19                  MS. SKLENAR:  Objection.

Daniels.txt

22  different from what I have just described to

23  you --

24            MS. SKLENAR:  Objection.

25       Form.

□                                                          19

1  Q     -- if it is?

2  A     It is.  The rigid PVC that you describe

3  for pipe is a very simple formulation.  It is

4  made to sheath wiring in a conduit or conduct

5  or carry water in a piping application.

6        The flexiblized PVC is one in which

7  ingredients are added to it so that rather

8  than being a stiff rigid material, it's

9  capable of being flexed, capable of being

10 bent.  It can be made transparent.  It can be

11 made into colored formulations.

12       Common application for which is,

13 although it's not this particular one,

14 insulation for wire is a classification of

15 flexible PVC.

16 Q     Do you have now or have you ever had

17 any kind of relationship with Advanced

18 Bionics?

19 A     No, I have not.

20 Q     Do you have now or have you ever had a

21 relationship with a company called Boston

22 Scientific?

23 A     Polymer Diagnostics did work for Boston

24 Scientific, however, not in this area.

25 Q     In what area?

□                                                          20

Daniels.txt

1  A     Other types of medical devices but not
2  neurostimulator leads.
3  Q     Did Polymer Diagnostics or any of the
4  companies that you ever worked for do any
5  work on neurostimulator leads?
6  A     Not to my knowledge.
7  Q     So prior to the time that you were
8  hired in this case, you had never had the
9  opportunity or the occasion to consider what
10 materials might be appropriate for a
11 neurostimulator lead?
12 A     That's correct.
13 Q     Is that something you feel like you
14 could do?
15            MS. SKLENAR:  Objection.
16        Form.
17 A     I think I'm capable of commenting on
18 the appropriateness of certain materials for
19 use in implantable devices.  Whether they
20 would be specific for neurostimulator leads,
21 obviously, there's a specific set of
22 requirements for that particular application
23 that might be different from other
24 implantable devices.
25 Q     In fact, one of the things that you do

☐                                               21

1  and you have done in your profession is to
2  know what you don't know and to refer clients
3  or customers to experts who might know more
4  about a given field than yourself; is that
5  correct?
                        Page 17

Daniels.txt

☐                                                                                26

1  A     I'm not sure I know what you're --

2  Q     That's because it was a really

3  unartfully asked question.

4  A     I know.

5  Q     The problem isn't yours.  It's mine.

6  A     Okay.

7  Q     Did you consult any resources to

8  determine what materials had successfully

9  been used in the past in neurostimulator

10  devices?

11  A     No.

12  Q     Would you agree with me that there

13  surely must be people out there who have some

14  experience with these specific kinds of

15  materials and would likely know what kinds of

16  materials had been used successfully in the

17  past in these applications?

18  A     May I restate your question?

19  Q     Sure.

20  A     You're asking me, are there people in

21  the world of neurostimulator leads that exist

22  that would know what materials are being used

23  in this application?

24  Q     Yes.

25  A     Certainly.

☐                                                                                27

1  Q     But you're not one of those people?

2                  MS. SKLENAR:  Objection.

3           Form.

Page 22

Daniels.txt

4  A     I am not one of those people, have not

5  developed a neurostimulator lead.

6  Q     And you haven't talked to any of those

7  people in preparing for your testimony?

8  A     No.

9              MR. BOREN:  Let's go off the

10        record for a second.

11              THE VIDEOGRAPHER:  Off the

12        record.

13              (Discussion off the record.)

14              THE VIDEOGRAPHER:  Back on

15        the record.

16  Q     Who prepared the first draft of Exhibit

17  1?

18  A     The process was as follows:   I had an

19  opportunity to examine the patent and the

20  patent file.

21  Q     And the patent, just for the record?

22  A     The '045.

23  Q     Is the '045 patent?

24  A     Yes, sir.  I was asked to give comments

25  and opinions about the language and

□                                                    28

1  terminology that we've described.

2        I asked, because of constraints on my

3  time, to have Jennifer's firm capture my

4  comments, send them back to me for review,

5  which we did.  And I altered that so that I

6  was certain that the opinions would represent

7  my statements.

8  Q     Then what?

Daniels.txt

23  understanding of virtually all aspects of the

24  devices and their design," et cetera,

25  correct?

☐                                                                        38

 1  A      That's what it says.

 2  Q      On what basis do you criticize that

 3  statement?

 4  A      It would be very unusual, and I don't

 5  believe this ever existed in my experience,

 6  for product development teams consisting of a

 7  group of experts, for each and every one of

 8  those experts to fully understand and become

 9  expert in each of the fields represented by

10  the other experts on a team.

11         They would contribute their own

12  expertise, they would certainly learn things

13  from one another, but they certainly wouldn't

14  be considered experts in those other areas

15  after having worked on those teams.

16  Q      I don't find the word "expert" anywhere

17  in that first full paragraph of page 9.  Do

18  you?

19  A      No, I don't.

20  Q      Mr. Robinson does say understanding

21  which -- let me just ask you.  Do you believe

22  understanding something is the same thing as

23  being an expert in it?

24  A      I'm sorry.  He says, "Detailed

25  understanding of virtually all experts."

☐                                                                        39

Daniels.txt

1   Q       "Aspects"?

2   A       Correct.  That's not just understanding

3   in my interpretation.

4   Q       You believe that -- what do you believe

5   it is?

6   A       I believe it is -- he is indicating

7   that each person on the team could take the

8   place of others on the team, in terms of

9   their expertise, after having been exposed to

10  this team environment.

11  Q       But your basis for criticism of his

12  statement does not come from having served on

13  such an implantable stimulation team

14  yourself, correct?

15  A       Correct.

16  Q       Because you have never done that?

17  A       That's correct.

18  Q       If we can believe what Mr. Robinson

19  says in his report, he has done that,

20  correct?

21  A       That's correct.

22  Q       What is the field of the '045 patent?

23  A       The field of the '045 patent?

24  Q       Yes.

25  A       The construction of and the function of

                                                    40

1   a neurostimulator lead.

2   Q       You have never constructed a

3   neurostimulator lead, have you?

4   A       No.

5   Q       You have never participated in the

Page 33

Daniels.txt

6  construction of a neurostimulator lead, have

7  you?

8  A      That's correct.

9                    MR. BOREN:  Let's take a

10          short break.

11                   THE VIDEOGRAPHER:  Off the

12          record at 10:21.

13                   (Recess had.)

14                   THE VIDEOGRAPHER:  Back on

15          the record at 10:34.

16  Q     Dr. Daniels, if you would turn to your

17  report in this matter, which is Exhibit

18  Number 1.  In paragraph 10 on page 2 of

19  Exhibit Number 1 you tell us that you're

20  compensated at $400 per hour for time spent

21  providing deposition or other testimony,

22  correct?

23  A      Correct.

24  Q     Is it true that you're being paid $400

25  per hour for your time today?

☐                                                                      41

1  A      Yes.

2  Q      How much have you been paid so far by

3  your client, either AB or the lawyers?

4  A      I have submitted invoices but have not

5  yet been paid.

6  Q      How much total have you submitted in

7  invoices?

8  A      Approximately $3,000.

9  Q      How much additional time have you

10  incurred that you have not yet billed, do you

Daniels.txt
16  patent are too broad or too vague, it is
17  possible that the validity of the patent
18  might be challenged, but that's not my
19  bailiwick.
20  Q     But you do offer a number of opinions
21  in Exhibit Number 1 to the effect that a
22  skilled person wouldn't understand given
23  terms, correct?
24  A     That is correct.
25  Q     One of the problems -- one of the terms

▯                                                                    43

1  that you have problems with is the term
2  "consistent", correct, page 6, paragraph 25?
3                  MS. SKLENAR:  Objection.
4          Form.
5  A     In paragraph 25, page 6 I did state
6  that, "A skilled person would not understand
7  from the language 'consistent with.'"
8  Q     What's your basis for that opinion?
9  A     It is too vague a term.
10  Q     Too vague for whom?
11  A     Someone skilled in the art.
12  Q     Which art?
13                 MS. SKLENAR:  Objection.
14         Form.
15  A     You're talking about the lead body
16  materials, which are comprised of plastics or
17  polymers, and someone skilled in the art of
18  plastics or polymers would ask for something
19  more definitive than the term "consistent
20  with" when describing the properties of one

                        Page 36

Daniels.txt

21  or more materials.

22  Q      Do you know whether someone skilled in

23  the art of implantable leads would require

24  more information to understand "consistent

25  with"?

44

1                    MS. SKLENAR:  Objection.

2           Form.

3   A      I don't know that.  I would hope so.

4   Q      But you don't know, correct?

5   A      I don't know.

6   Q      Did you look up "consistent" in the

7   dictionary?

8   A      Not recently.

9   Q      You didn't do it for purposes of this

10  case?

11  A      No.

12  Q      So you didn't consider the plain and

13  ordinary meaning of the term?

14                   MS. SKLENAR:  Objection.

15          Form.

16  A      Consider it?

17  Q      "Consistent."

18  A      I'm sorry.  Consider the term?

19  Q      Yes.

20  A      Certainly I considered the term.

21  Q      My question was more specific.  Did you

22  consider the plain and ordinary meaning of

23  the term?

24  A      Yes.

25  Q      What is the plain and ordinary meaning

Page 37

Daniels.txt
8   A     Go ahead, please.

9   Q     You said you could compound SBR rubber

10  in such a way that it would have similar

11  chemical and mechanical properties to another

12  substance.  Do you recall saying that?

13              MS. SKLENAR:  Objection.

14          Form.

15  Q     I don't remember what the other

16  substance was because it was very technical

17  sounding to me.

18  A     Okay.

19  Q     I'm trying to first understand why you

20  used the word "similar," and in my attempt to

21  understand that, I want to ask you what

22  similar means in that context?

23              MS. SKLENAR:  Objection.

24          Form.

25  A     I meant, as I said here, you could take

☐                                                      <u>54</u>

1   and compound these and have the same

2   properties.

3   Q     So you just didn't mean to say

4   "similar"?

5              MS. SKLENAR:  Objection.

6          Form.

7   A     I did not mean to say "similar".

8   Q     What is the difference between same and

9   similar?

10  A     Similar is in my mind close but not

11  exact.  Same is identical.

<u>12  Q     On several occasions in your report you</u>

Page 45

Daniels.txt

13  take issue with the term "substantially", do

14  you not?

15  A     I do.

16  Q     Why?

17  A     I'm not sure what it means in terms of

18  defining what substantially filled or

19  substantially surrounds or substantially

20  isodiametric means.

21  Q     Let me ask you.  What would exactly

22  isodiametric be?

23  A     It would mean exactly isodiametric.

24  Q     That's what we call a tautology.  Let

25  me break it down.

□                                                                    55

1          Isodiametric means what?

2                    MS. SKLENAR:  Objection.

3            Form.

4   A     It means having the same diameter.

5   Q     For the full length of the object,

6   whatever it is, correct?

7   A     If that's where you're using it, yes.

8   Q     That's certainly where it's being used

9   in this case, is it not?

10  A     Okay.  Let's choose that as an example.

11  Q     I'm going to choose another example

12  because it's a little easier to understand.

13          The leads that we're talking about here

14  are dozens of centimeters long in some cases,

15  are they not?

16  A     Yes, they are.

17  Q     Let's move over to a garden hose, which

Page 46

Daniels.txt

2  isodiametric for now.

3       How do you know what isodiametric means

4  when you know as a matter of physics that

5  anything made up of molecules is going to

6  comprise different diameters depending on

7  where the measurement is taken?

8  A     You would make the judgment on what

9  isodiametric meant or substantially

10  isodiametric meant in the context in which it

11  was used.

12  Q     You will have to explain that to me

13  because I don't get it.

14  A     Your example was isodiametric at the

15  molecular level.  Okay?

16  Q     Yes.

17  A     I could say, well, what about

18  isodiametric at the gross surface diameter

19  level.  Two different contexts.

20  Q     Different measurement scales?

21  A     Absolutely.

22  Q     Back to my garden hose example.  If one

23  purchased a three-quarter inch diameter

24  garden hose in the real world, one would

25  ordinarily expect that three-quarter inch

⬚                                                    <u>59</u>

1  garden hose to vary some along its length but

2  to be generally three-quarters of an inch in

3  diameter, wouldn't one?

4  A     There would be some variation.

5  Q     Variation on a much larger level than a

6  molecular level, fair enough?

Page 49

Daniels.txt

7  A      Fair enough.

8  Q      The same thing, now we're going to a

9  lead which is much, much smaller than a

10 garden hose, correct?

11 A      Correct.

12 Q      In fact, can you give us a sense of how

13 small these leads are?

14 A      I believe in your -- in the patent,

15 which I don't have a copy in front of, there

16 are some dimensions actually given in one of

17 the paragraphs.

18 Q      There are.

19 A      Tenths to hundredths of centimeters, I

20 believe reported.

21 Q      To the lay person it's actually a very,

22 very small diameter, isn't it?

23 A      To the lay person, that's true.  That

24 is true.

25 Q      Have you ever seen one of these?

                                                                    60

1  A      Not up close.

2  Q      Have you ever seen one far away?

3  A      It would be harder to see far away than

4  up close, wouldn't it, given the dimensions.

5  No, I have not actually observed a

6  neurostimulator lead.

7  Q      They're little bitty around, you're

8  right about that.  I don't think little bitty

9  is in the patent.

10 A      I thought maybe it was a new technical

11 term.

                         Page 50

Daniels.txt
25  A      Yes, I see that.

☐                                                          70

 1  Q      And, again, in paragraph 24, the same
 2  term, "substantially round."  Do you see
 3  that?
 4  A      Yes, I see that.
 5  Q      And, again, in paragraph 32 on page 3,
 6  there's a reference to a substantially round
 7  pad, is there not?
 8  A      Yes, there is.
 9  Q      And then, again, in paragraph 32 on
10  page 4 near the top, there's a reference to
11  -- two references to substantial -- near the
12  top of page 4, also paragraph 32, there are
13  two references to the term "substantially
14  covering."  Do you see those in the first
15  half of that partial paragraph?
16  A      Fifth sentence down or so, "second
17  surface with a pad substantially covering"?
18  Q      Yes, sir.  It's in the second line as
19  well.
20  A      I'm sorry.  "In the first surface of
21  the pad substantially covering" --
22  Q      Do you see two references to
23  "substantially covering" in that paragraph?
24  A      Yes.
25  Q      In paragraph 15 of the claims, claim

☐                                                          71

 1  15, the terms "substantially flat" and
 2  "substantially round" both appear, do they
 3  not?
                            Page 59

Daniels.txt

4   A     They do appear.

5   Q     Would you agree with me that there's a

6   possibility that people who are skilled in

7   the art of implantable medical devices might

8   attach a meaning to "substantial" or

9   "substantially" that you might not be aware

10  of?

11              MS. SKLENAR:  Objection.

12          Form.

13  A     My answer to the question is that that

14  is still a vague and general term.  It does

15  not, in my mind and, again, not having read

16  this document, so I can't be sure where

17  they're applying this term, it's very

18  difficult at first glance to understand what

19  their meaning is.

20              MR. BOREN:  That really

21          wasn't my question.  I'm going to

22          object to that as non-responsive.

23  Q     Would you agree with me, would you not,

24  that it's possible that those skilled in the

25  art of implantable medical devices might

                                                72

1   attach a meaning to "substantially" of which

2   you are unaware?

3   A     Anything is possible.

4   Q     You need to answer that question yes or

5   no.

6   A     Yes, it is possible.

7   Q     I may have asked you this.  If I did, I

8   apologize.

Page 60